UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------X
ERIC RAMIREZ,

                Petitioner,                            MEMORANDUM & ORDER
                                                                     03-CV-5202 (NGG)

           - against -

THOMAS POOLE, Superintendent,
Five Points Correctional Facility,

                Respondent.
----------------------------------------------X
GARAUFIS, United States District Judge.

      Pro se petitioner Eric Ramirez brings this application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Ramirez challenges his 2001 conviction in Queens County, New York for Attempted Robbery in the Second Degree (N.Y. Penal Law §§ 110.00/160.10[2][a]). For the reasons set forth below, the petition is denied.

**I.    BACKGROUND**

      *A.    Prosecution and Conviction*

      On the evening of August 21, 1999, Yun Wee Hwang was robbed at the corner of 28th Street and Queens Plaza South, Queens County. (Affidavit of Ellen C. Abbot (hereinafter "Abbot Aff.") at ¶ 4.) Hwang resisted the robber's attempts to wrest her bag away from her and was thrown to the ground and dragged down the sidewalk and kicked in the head and back. (Id.) The assailant fled when people in the area responded to Hwang's cries for help, leaving the scene of the crime in a four-door white Mazda bearing the license plate number Z561YG. (Id.) Three days after the attack, Ramirez was spotted in the same vehicle and apprehended. (Id.) After Hwang identified Ramirez as the man who attacked her during a lineup, he was arrested.

1

(Id.)

Ramirez was indicted in Queens County and proceeded to a jury trial in Supreme Court, Queens County. (Id. at ¶¶ 5-6.) During the first round of jury selection, the prosecution made two reverse-Batson challenges arguing that the defense was using its peremptory challenges in a racially discriminatory manner by challenging a white juror and an Asian juror. (Id. at ¶ 7.) The two challenged jurors were seated by the trial judge. (Id.)

Ramirez was eventually convicted of Attempted Robbery in the Second Degree and sentenced on March 22, 2001. (Id. at ¶ 12.)

B. *Procedural History*

Ramirez appealed his conviction to the Appellate Division of the New York State Supreme Court, Second Department. (Id. at ¶ 13.) The grounds for Ramirez's appeal were as follows: (1) the trial court erroneously denied the two of his peremptory challenges to jurors by conflating steps two and three of the Batson analysis and because the court sought to create a racially diverse jury; (2) the trial court erroneously permitted the prosecutor to cross-examine Ramirez's alibi witness about her failure to cooperate in the prosecution of Ramirez for a separate case in order to establish the witness's bias towards Ramirez and her lack of credibility as a witness; and (3) the prosecutor engaged in misconduct in her summation. (Abbot Aff., Ex. 1.)

On February 3, 2003, a four-judge panel of the Appellate Division affirmed Ramirez's conviction. People v. Ramirez, 302 A.D.2d 409, 754 N.Y.S.2d 554 (2d Dep't 2002). The Appellate Division held that the trial court properly disallowed his two peremptory challenges because its determination that the challenges were a pretext for racial discrimination "is

supported by the record." Id. at 410. Specifically, the Appellate Division reasoned: "The explanation of the defense counsel that one prospective juror would be preoccupied with her daughter's upcoming party was contrary to what the juror had stated. Further, the defense counsel challenged another juror on the basis that she was timid, but he did not challenge another soft-spoken juror (*see People v. Allen*, 86 NY2d 101, 110)." Id. The Appellate Division also found that Ramirez's remaining contentions were either unpreserved for appellate review or lacked merit. Id.

Ramirez next sought leave to appeal to the New York Court of Appeals. In his leave application, he requested review of the issues he had raised on direct appeal. He specifically argued, relying on United States v. Nelson, 277 F.3d 164 (2d Cir. 2002), that the decision to seat the Asian juror he had challenged violated the Equal Protection Clause because it reflected a desire to achieve a racially diverse jury. (Abbot Aff., Ex. 5 and 7.) On June 27, 2003, a judge of the Court of Appeals denied Ramirez permission to appeal further. People v. Ramirez, 100 N.Y.2d 565, 763 N.Y.S.2d 822 (2003).

Finally, Ramirez filed this timely petition for a writ of habeas corpus on October 8, 2003.

## II.     STANDARD OF REVIEW

A federal court may issue a writ of habeas corpus only if the petitioner's custody is in "violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a). See, e.g., Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam). Thus, a prisoner seeking the writ must allege that his conviction or sentence in state court violates constitutional or other federal rights.

Under the exhaustion requirement of 28 U.S.C. § 2254(b)(1), a state prisoner petitioning

for a federal writ of habeas corpus generally must have first presented his claim to the state's highest court. Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Morgan v. Bennett, 204 F.3d 360, 369 (2d Cir. 2000). In New York, this means that a defendant, having first appealed to the Appellate Division of the Supreme Court, must then seek leave to the Court of Appeals to review his conviction pursuant to New York Criminal Procedure Law § 460.20 (McKinney 1994). See id. But if the petitioner no longer has "remedies available" in state court under 28 U.S.C. § 2254(b), the claim should be considered exhausted. Bossett v. Walker, 41 F.3d 825, 828-29 (2d Cir. 1994) (collecting cases).

Habeas review is also circumscribed by procedural defaults. In addressing a habeas petition, a federal court must not "review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991). Further, this "doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." Id. Even in a case where the state court addresses the merits of the petitioner's federal claim in an "*alternative* holding," federal habeas review is not permitted if the state court "explicitly invokes a state procedural bar rule as a separate basis for decision." Harris v. Reed, 489 U.S. 255, 264 n. 10 (1989) (emphasis in original).

Exceptions exist to the independent and adequate state ground bar if the petitioner can make a showing of cause for the default and resulting prejudice, see Wainwright v. Sykes, 433 U.S. 72, 87 (1977), or can "demonstrat[e] a constitutional violation that resulted in a fundamental miscarriage of justice, *i.e.*, that he is actually innocent of the crime for which he has

4

been convicted." Dunham v. Travis, 313 F.3d 724, 729 (2d Cir. 2002). "To be credible such a claim [of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence . . . that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Schlup v. Delo, 513 U.S. 298, 324 (1995).

If the petitioner complies with these preliminary requirements, a federal court may address the merits of the constitutional claim. Under 28 U.S.C. § 2254(d), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

In clarifying these provisions, the Second Circuit has explained that an "adjudication on the merits" means one "based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001). The Supreme Court has explained that the "contrary to" standard means that a district court "should ask whether the state court's application of clearly established federal law was objectively unreasonable." Williams v. Taylor, 529 U.S. 362, 409 (2000). The Court went on to elaborate that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

5

**III.    DISCUSSION**

In his petition, Ramirez raises the same three claims presented in his direct appeal.  These include: (1) that the trial court erred in sustaining the prosecutor's objection to defense counsel's peremptory challenges, thereby depriving Ramirez of due process, of equal protection and of the right to a fair trial; (2) that the trial court erred in allowing the prosecutor to question Ramirez's alibi witness about her failure to cooperate in a prior assault case against Ramirez; and (3) that the prosecutor's comments during summation regarding Ramirez's alibi witness were prejudicial and constituted prosecutorial misconduct.  (Petitioner's Traverse Brief (hereinafter "Tr. Br.") at i.)  These claims are considered in turn.

   *1.    Peremptory Challenges*

Ramirez first contends that he was deprived of his rights to due process, equal protection and a fair trial when the court sustained the prosecutor's objection to defense counsel's peremptory challenges to two jurors.  (Tr. Br. at 1.)  In making his argument, Ramirez misconstrues Batson v. Kentucky, 476 U.S. 79, 89 (1986), as holding that peremptory challenges are constitutionally required.  Because there is no such constitutional requirement, and because the use of peremptory challenges is based upon state law, the state court's denial of two of Ramirez's peremptory challenges cannot provide a basis for federal habeas relief.

In support of his argument, Ramirez cites the following portion of Batson: "Accordingly, the component of the jury selection process at issue here, the State's privilege to strike individual jurors through peremptory challenges, is subject to the commands of the Equal Protection Clause."  476 U.S. at 89.  Based on this quotation, Ramirez contends that although peremptory challenges may not be constitutionally derived and are created through state law, that through the

Fourteenth Amendment, Batson still has the effect of requiring states to afford due process and equal protection in their usage. (Tr. Br. at 2.)

The most obvious flaw with Ramirez's argument is that it misconstrues the import of the quotation from Batson. The Batson opinion was directed at ensuring that discrimination, in contravention of the Equal Protection Clause, was not employed in jury selection and that an impartial jury would be empaneled; it was not, however, concerned with establishing any overarching right to utilize peremptory challenges. The sentence immediately following the portion of the opinion Ramirez quotes makes this point clear. The Court continued:

> Although a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his view concerning the outcome of the case to be tried, the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.

Id. (quotations and citations omitted). Thus, Batson did not expand the right to peremptory challenges as Ramirez seems to contend, so much as it cabined the manner in which such challenges could permissibly be deployed.

This reading of the case is in line with a legion of other cases in which the Supreme Court has repeatedly held that peremptory challenges are not constitutionally required. See Ross v. Oklahoma, 487 U.S. 81, 88 (1988) ("But we reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury. We have long recognized that peremptory challenges are not of constitutional dimension."); Gray v. Mississippi, 481 U.S. 648, 663 (1987) ("Peremptory challenges are not of constitutional dimension."); Stilson v. United States, 250 U.S. 583, 586 (1919) ("There is nothing in the Constitution of the United States which requires the Congress to grant peremptory challenges.").

7

As the Supreme Court explained in Georgia v. McCollum, 505 U.S. 42, 57 (1992):

> peremptory challenges are not constitutionally protected fundamental rights; rather, they are but one state created means to the constitutional end of an impartial jury and a fair trial. This Court repeatedly has stated that the right to a peremptory challenge may be withheld altogether without impairing the constitutional guarantee of an impartial jury and a fair trial.

See also United States v. Martinez-Salazar, 528 U.S. 304, 311 (2000) ("unlike the right to an impartial jury guaranteed by the Sixth Amendment, peremptory challenges are not of federal constitutional dimension.") (citations omitted). Based on this precedent, it is abundantly clear that there is no constitutional right to peremptory challenges.

Here, Ramirez has only alleged that the trial court did not allow him to exercise two of his peremptory challenges; he has made no assertion that an impartial jury was not empaneled. As a result, the right upon which Ramirez bases this claim is not a federally protected one, but only one provided by New York state law. As such, Ramirez's claim is not cognizable on federal habeas review. See Haywood v. Portuando, 288 F.Supp.2d 446, 463 (S.D.N.Y. 2003) ("even if the trial court incorrectly denied [petitioner] a peremptory challenge, that denial did not violate the federal Constitution."); Black v. Herbert, No. 00 Civ. 8825, 2002 WL 1880711 (S.D.N.Y. Aug. 14, 2002) (finding that no federal question was presented by a habeas petition challenging the trial court's denial of the opportunity to strike jurors for non-discriminatory reasons); Green v. Kelly, No. 99 Civ. 9082, 2000 WL 1871711, at *6 (S.D.N.Y. Dec. 21, 2000) (same). Accordingly, this claim is denied.

   *2.   Improper Questioning of Alibi Witness*

In his second claim, Ramirez contends that his right to a fair trial and due process were violated by the prosecutor's questioning of Ramirez's alibi witness and former girlfriend,

8

Jacqueline Rodriguez, concerning an assault of Rodriguez by Ramirez. While Ramirez does not dispute that the prosecutor had the right to cross-examine Rodriguez concerning any bias she may have had in favor of Ramirez that would affect her credibility with the jury, he objects to the manner in which the prosecutor introduced details of the assault during the cross-examination. (Tr. Br. at 17 n.6.) Specifically, he claims that the following question from the prosecutor to Rodriguez prejudiced the jury into believing that Ramirez habitually abused women: "And isn't it true that [Ramirez] came to your work at around lunch time, grabbed you, pulled you into the car and hit you about your body, pulled your hair, causing you scratches and bruises?" (Trial Transcript (hereinafter "T.") at 519.) After an objection from the defense that was overruled, the prosecutor asked Rodriguez, "Isn't that what happened on October 31?," to which she responded: "That -- there was a struggle, yes. Yes." (Id.)

Ramirez has failed to establish that the introduction of this questioning and testimony constituted the violation of a constitutional right. Generally, "[t]he introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'" Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) (quoting Dowling v. United States, 493 U.S. 342, 352 (1990)). But where the prejudicial evidence is "'probative of [an] essential element' in the case, its admission does not violate the defendant's right to due process." Id. (quoting Estelle v. McGuire, 502 U.S. 62, 69 (1991)).

The testimony to which Ramirez objected was properly admitted at trial because it bore directly on whether Rodriguez was biased in favor of Ramirez. See United States v. Abel, 469 U.S. 45, 52 (1984) ("Proof of bias is almost always relevant because the jury, as finder of fact

9

and weigher of credibility, has historically been entitled to assess all the evidence which might bear on the accuracy and truth of a witness' testimony."). Although the testimony was clearly prejudicial to Ramirez, eliciting the seriousness of the assault was necessary to allow the jury to have a full understanding of Rodriguez's potential bias. If Rodriguez was unwilling to pursue charges against Ramirez after such a serious assault, the jury could reasonably infer that her testimony in this case was likewise affected by a desire to protect Ramirez from the ramifications of his actions. Such motivation bore directly on Rodriguez's credibility as a witness and thus was probative of Ramirez's alibi defense.

In addition to the fact that the testimony was probative of a central issue in the case, it was also accompanied by a limiting instruction from the judge that advised the jury of the purposes for which Rodriguez's testimony could be considered. The judge instructed the jury as follows:

> Now, members of the jury, let me make a cautionary observation and instruction. This testimony regarding one or more incidents between the parties, or between Miss Rodriguez and Eric Ramirez, that is permitted into a limited extent to come out during this trial only, only to the extent that it may give you information regarding the credibility of Miss Rodriguez and her testimony in this trial, and not in any way be held against Eric Ramirez for any prior conduct of his or in any way to be weighed against him as evidence that he may be guilty of the crime charged. It is not to be considered on that issue at all, only to the extent that it may be at all useful to your judging the credibility of the witness as you have to judge credibility of all testimony.

(T. at 525-26.) This instruction clearly and repeatedly explained that the jury was only to consider this evidence for its proper purpose of assessing Rodriguez's credibility and not to gauge Ramirez's propensity for violence. "Such limiting instructions are an accepted part of our present trial system, and consequently there is a presumption that juries will follow them." United States v. Ebner, 782 F.2d 1120, 1126 (2d Cir. 1986) (internal quotations and citations

10

omitted).

Even if the testimony was improperly admitted at trial, Ramirez has failed to demonstrate that it constituted a due process violation. "For the erroneous admission of other unfairly prejudicial evidence to amount to a denial of due process, the item must have been sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." Dunnigan, 137 F.3d at 125 (internal quotations and citations omitted). The assessment of materiality turns on evaluating the impact of the erroneously admitted information in the context of the entire trial record. Id.

Judged against the strong proof of Ramirez's guilt that was offered at trial, the admission of the testimony concerning his assault of Rodriguez did not deprive him of the fundamental fairness necessary to make out a due process violation. Among the evidence offered against Ramirez was the testimony of the victim, Yun Wee Hwang, who positively identified Ramirez as her attacker, both at trial (T. at 299) and in a police lineup. (T. at 309; 368-73.) Hwang also testified that she had previously seen Ramirez in her store "two or three times," a fact that presumably strengthened her ability to positively identify him as her assailant. (T. at 302) This evidence alone was likely sufficient to allow Ramirez's conviction. See United States v. Danzey, 594 F.2d 905, 916 (2d Cir.), cert. denied, 441 U.S. 951 (1979) ("[T]he testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction.").

Ramirez was also directly linked to the crime because he was found driving the car in which the assailant fled the scene. Days after the crime, the police stopped a car bearing the same license plate as, and matching the description of, the getaway car and found that Martinez was driving it. (T. at 365-66; 425.) Scott Enderby, who witnessed the attack from his car,

11

chased the attacker as he ran down the street until he too entered a car, and then continued to follow that vehicle until he judged it too dangerous to continue the pursuit, testified that the license plate of the car he tailed was "Z561YG." (T. at 449-52.) Although Rodriguez testified for the defense that one of her license plates had been stolen the very day of the crime, thereby raising the possibility that Ramirez was just the victim of a case of mistaken license plates, the description of the vehicle provided by Enderby was also identical to the car in which Ramirez was found. Enderby, who indicated that he "do[es] mechanical work and . . . pretty much knows cars" (T. at 462), testified that the car he observed the assailant entering was a "white four-door car, tinted windows" and that he "believe[d] it was a Mazda." (T. at 451.) Detective Lopez, who investigated the crime, described the car in which Martinez was stopped as a "1993 Mazda, white in color with tinted windows" and went on to say that she "believe[d] it was four doors." (T. at 365.) The arresting officer testified that it was "a white Mazda Millenium [sic], four doors." (T. at 422.)

Although Enderby was not able to positively identify Ramirez at trial because the attack was "such a long time ago" (T. 476), his description of the assailant from his memory of that day -- "tall, slim, Hispanic, short, pretty short hair, slight mustache. He was approximately 6 feet, maybe a little smaller, very slim." (T. at 450) -- closely matches the description of Ramirez provided by Detective Lopez, who testified that Ramirez was a "male Hispanic in his twenties, 5'11", approximately 190 pounds, short hair." (T. at 367.) While a positive identification by Enderby would certainly have eliminated even more doubt about Ramirez's guilt, his testimony as it stood was damning. The confluence of Enderby's description of the car he saw at the scene of the crime and the details concerning the car in which Martinez was found was certainly

sufficient to cast considerable doubt on the veracity of Rodriguez's assertion that she was home with Ramirez at the time of the crime.

Finally, the jury heard testimony that about a month after the lineup Ramirez visited Hwang's store in Long Island City to give her toy bear and a rose. Hwang testified that when she saw him in the store, Ramirez told her "I did not, he said I did not, I did not want to hurt you. I'm sorry what happened, but, you know, I did not mean to hurt you and why didn't, why don't you think about it once more?" (T. at 310.) Hwang also testified that Ramirez denied his guilt more directly, saying "I didn't do it and I'm sorry." (Id.) Whether Ramirez was admitting or denying his involvement in the attempted robbery is hard to fish out of the ambiguity of these statements, but the real significance of Ramirez's visit is that it demonstrates his awareness of the location of Hwang's store. Although it is certainly possible that Ramirez learned this information during the course of the proceedings against him, it also suggests that he had previously visited the store, as Hwang testified. This fact bolsters the veracity of Hwang's testimony and with it the credibility of her identification of Ramirez as her attacker.

Ramirez contends that in fact there was not strong proof offered against him and that the prejudice caused by the prosecutor's questioning of Rodriguez was therefore sufficient to affect the outcome of the trial and rob him of due process. In making this claim, Rodriguez points to minor flaws or inconsistencies in the evidence but falls far short of demonstrating that the potential prejudice of the testimony either provided the basis for conviction or eliminated a potential reasonable doubt that would have existed without it.

Ramirez first suggests that Hwang's identification of him in the lineup was flawed because she did not wear her eyeglasses at the time and because at trial she indicated that her

13

attacker was 5'8" or 5'9" tall. (Tr. Br. at 17.) While Hwang did indicate that she was not wearing her eyeglasses at the time of the lineup, she also testified that she needed the glasses "primarily to protect my eyes" and because she had trouble seeing things in "the very far distance." (T. at 315-16.) Since Hwang viewed a lineup that was only six or seven feet away (T. 372-73), her inability to see in the distance is inconsequential. Similarly, that Hwang seems to have underestimated Ramirez's height by a couple of inches does not undo the fact that she positively identified him both in a lineup and at trial as the man who tried to rob her. Ramirez also suggests that Enderby's failure to identify him at trial weakens the prosecution's case. Even with this shortcoming, Enderby still provided testimony that directly linked Ramirez to the car in which the assailant fled the scene. Thus, the weight of the evidence clearly demonstrated that Ramirez was guilty of attempted robbery.

For these reasons, this claim is denied.

### 3. *Improper Summation*

Martinez's final claim is that the prosecutor's summation was sufficiently prejudicial to deprive him of his right to a fair trial and due process. Specifically, Martinez claims that during her summation the prosecutor improperly commented on Hwang's fear and demeanor, as well as impermissibly attacked Rodriguez's credibility.

As an initial matter, the court must determine the appropriate standard of review to apply to this claim. Ramirez argues that the court should not accord deference to the Appellate Division's decision under 28 U.S.C. § 2254(d) because its holding that the "remaining contentions are either unpreserved for appellate review or lack merit" makes it unclear whether the claim was procedurally defaulted or actually decided on the merits. (Tr. Br. at 19-20.) The

case Ramirez cites in support of this assertion, Rudenko v. Costello, 286 F.3d 51 (2d Cir. 2002), has since been withdrawn by the Second Circuit and thus is no longer good law. See Rudenko v. Costello, 322 F.3d 168, 170 (2d Cir. 2003). Instead, the court is guided by Miranda v. Bennett, 322 F.3d 171, 178 (2d Cir. 2003), where the Second Circuit indicated that "[i]f the record makes it clear . . . that a given claim had been properly preserved for appellate review, we will conclude that it fell into the 'without merit' part of the disjunct even if it was not expressly discussed by the Appellate Division." Here, the record indicates that this issue was preserved for appellate review, fully briefed by both parties, and thus considered on the merits by the Appellate Division; accordingly, the court applies the deferential standard appropriate under § 2245(d). And under that deferential standard, the court concludes that the Appellate Division's determination was neither contrary to, nor involved an unreasonable application of, federal law.

In order for a prosecutor's summation to deny a defendant due process, it must involve "egregious conduct." United States v. Shareef, 190 F.3d 71, 78 (2d Cir. 1999) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 647 (1974)). Further, the prosecutor's comments must be examined in the context of the trial as a whole. United States v. Melendez, 57 F.3d 238, 241 (2d Cir. 1995) (citations omitted). Ramirez thus bears a significant burden in order to merit habeas relief. He must show "that he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict." Bentley v. Scully, 41 F.3d 818, 823 (2d Cir. 1994) (internal quotation marks and citation omitted). In making such an evaluation, a court should look to three factors: "the severity of the misconduct, the measures adopted to cure it, and the certainty of conviction in the absence of misconduct." Id. (collecting cases). After this court's review of the summation and

15

the entire trial record, it finds that the Appellate Division correctly determined that this claim was without merit for the reasons that follow.

      *a.*      *Comments Regarding Hwang*

Ramirez's first contention is that the prosecutor improperly commented on Hwang's demeanor and implied that she was scared to testify against Ramirez. In particular, Ramirez takes exception to the following portion of the prosecutor's summation:

> I don't know if any of you notice this, but do you recall her demeanor as she entered the courtroom? I recall how she entered. I submit to you she looked over and couldn't even be near him. She was filled with fear as she walked in. Ladies and gentlemen as she walked in she did have an opportunity to see him and she was scared to death. She tried to walk around this way.

(T. at 578-80.) Ramirez contends that these statements represented an attempt to elicit sympathy from the jury for Hwang and to provoke anger against himself. Further, he contends that because Hwang did not testify concerning her fear, the prosecutor was commenting on matters that were not part of the record.

While comments from the prosecutor regarding what a witness was thinking were certainly improper, they were not severely prejudicial to Ramirez. Addressing a witness's demeanor during her testimony was a topic that was well within the bounds of an acceptable summation; the problem lay only with commenting on what Hwang was thinking. And any prejudice that may have been created by this aspect of the comments was immediately addressed by an instruction from the judge following defense counsel's objection. The judge admonished the prosecutor that she could properly ask the jury to infer what a witness was thinking but that commenting directly on this issue was not allowed. (T. at 580.) Ramirez seems to claim that no limiting instruction was made by the judge, perhaps because the judge's comments were directed

at the prosecutor.  The court, however, is unconvinced by such hairsplitting.  While it would certainly have been preferable that the court directly addressed the jury, it was, nonetheless, made aware that the prosecutor's comments were in some way improper.  The jury then immediately learned that the prosecutor was only allowed to ask the jury to infer what Hwang was thinking; the clear implication being that it was impermissible to tell them directly. Moreover, moments earlier in the prosecutor's summation, the court was more explicit in instructing the prosecutor not to comment on people's thoughts.  The judge instructed the prosecutor to "please be more careful about language in the area of what other people are thinking."  (Id. at 578.)  Based on this record, it was certainly not unreasonable of the Appellate Division to conclude that any prejudice caused by the prosecutor's comments was immediately addressed by the judge.

### b. *Comments Regarding Rodriguez*

Ramirez's next contention is that the prosecutor made inappropriate comments concerning incidents related to Rodriguez's testimony.  In order to understand Ramirez's claim, some details concerning the events of the testimony must be laid out.  While being questioned about her motivation for not pressing charges against Ramirez for assaulting her, Rodriguez explained "that was the first time incident that it ever happened and I felt no threat from Eric, so I didn't want to go ahead and press charges."  (T. at 520.)  In response, the prosecutor confirmed that Rodriguez's testimony was that the assault was the first incident she had with Ramirez and then immediately requested a sidebar.  (T. at 520-21.)  During a conference out of the presence of the jury and witness, the prosecutor indicated that she was in possession of a "61" filed by Rodriguez in 2000 alleging that Ramirez had "slapped her in the face and threatened her with

17

bodily harm." (T. at 521.) In response to this information, the judge took the cautious approach of questioning the witness out of the presence of the jury concerning this incident. Having had her memory refreshed, Rodriguez indicated that the assault at work was not the first incident of violence by Ramirez. The judge, continuing to act with great circumspection, then laid out the following plan:

> So, what I will do is permit the D.A. to ask the witness in front of the jury have you reconsidered your last answer and now do you believe that it was the -- that there was one earlier incident between you and Eric in August of 2000 and leave it at that? If you answer yes it would be left at that and you will leave this subject entirely and I will make a curative instruction to the jury.

(Id. at 521.) When the jury returned, events unfolded as the judge had planned.

The portions of the prosecutor's comments to which Ramirez objects dealt with the issues surrounding this correction of Rodriguez's testimony. Ramirez contends that these comments touched on issues outside the scope of the trial and infected the trial with prejudice, thereby depriving him of due process. The prosecutor said to the jury:

> She wanted to have you believe that that was the only incident she had ever dealt with the defendant. I submit, ladies and gentlemen, that as Miss Rodriguez, as she sat there on the witness stand looked you all in the eyes and said that was the first incident, she was assuming I had no idea about a prior incident.

(Id. at 576.) The judge immediately sustained an objection to this comment and the prosecutor continued discussing the incident, including the following comment: "When she learned that I knew she had made a prior report, only then --." (Id.) At this point the judge sustained an objection and provided the following limiting instruction to the jury: "The objection is sustained. The record shows that upon reflection and additional questions she said that there was a prior incident and that's it." (Id.)

Even though the prosecution's statements were improper, they were not sufficiently

18

egregious that they could have created actual prejudice in the context of the entire trial. One reason for this conclusion is that Ramirez overstates the significance of the prosecutor's comments. Because the discussions regarding the report of the first incident occurred outside the presence of the jury, confusion rather than prejudice was the likely result of the prosecutor mentioning having a report concerning the incident. But even if the comments caused prejudice, it was addressed by the judge's curative instruction, which clearly indicated that the only basis upon which Rodriguez had changed her story was "upon reflection and additional questions." (T. at 576.)

### c. *Evidence of Ramirez's Guilt*

The final consideration the court must make is an assessment of "the certainty of conviction in the absence of misconduct." United States v. Melendez, 57 F.3d at 241. Two factors militate in favor of the conclusion that Ramirez would have been convicted in the absence of the challenged statements. First, the alleged prosecutorial misconduct was confined to the closing argument, and thus, even if it did occur, it did not affect the entire trial. See Matthews v. Artuz, No. 97-CV-3334, 1999 WL 349694, at *5 (S.D.N.Y. May 27, 1999) (denying a claim that the prosecutor made improper comments during summation where, inter alia, they did not "permeate" the trial).

Additionally, based on the strong evidence of Ramirez's guilt produced at trial, even if some of the prosecutor's comments were improper, there is little likelihood that they had a substantial prejudicial impact on the jury's findings. Most significantly, and as discussed in more detail above, Hwang directly identified Ramirez as her attacker and Ramirez was also tied to the getaway car through the testimony of Enterby and Detective Lopez.

This evidence was sufficient for the jury to conclusively establish Ramirez's guilt and also to outweigh any prejudice that may have been caused by the prosecutor's summation. In particular, the evidence directly countered Ramirez's defense that he was with Rodriguez at the time of the attempted robbery. As a result, the court concludes that the Appellate Division's denial of this claim was reasonable.

Ramirez's claim of prejudice resulting from the prosecutor's summation is denied.

## IV.  CONCLUSION

For the reasons discussed above, Eric Ramirez's petition for a writ of habeas corpus is DENIED. A certificate of appealability shall not issue. The Clerk of the Court is directed to close the case.


SO ORDERED.


Date:  May 9, 2005  /s/ Nicholas Garaufis
       Brooklyn, New York  NICHOLAS G. GARAUFIS
         United States District Judge